ENVIRONMENTAL DEFENSE FUND, INC., Natural Resources Defense Council, Inc., Great South Bay Audubon Society, Inc., Lyman Langdon Audubon Society, Inc., Moriches Bay Audubon Society, Inc., Save Our Bays Association, South Shore Audubon Society, Inc., and the Long Island Environmental Council, Inc., Plaintiffs,

v.

Douglas M. COSTLE, Administrator, U. S. Environmental Protection Agency, Eckardt C. Beck, Regional Administrator, Environmental Protection Agency, the Environmental Protection Agency, Hugh L. Carey, Governor of the State of New York, Peter A. A. Berle, Commissioner of the Department of Environmental Conservation of the State of New York, New York State Department of Environmental Conservation, and the Department of Environmental Conservation of the State of New York, Defendants.

No. 74–C–1698.

United States District Court,
E. D. New York.

Sept. 16, 1977.

**984**

James T. B. Tripp, New York City, for plaintiff Environmental Defense Fund, Inc.

J. G. Speth, Washington, D. C., David W. Plant, New York City, for plaintiff Natural Resources Defense Council, Inc.

David Sive, New York City, for all plaintiff Audubon Societies c/o Winer, Neuburger & Sive, New York City.

Robert I. Skoy, Mineola, N. Y., for plaintiff Save Our Bays Assn.

William R. Ginsberg, Hofstra University—School of Law, Hempstead, N. Y., for plaintiff Long Island Environmental Council, Inc.

David W. Plant, Lars I. Kulleseid, John W. Schlicher, New York City, for all plaintiffs.

David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., for federal defendants; George H. Weller, J. Christopher Jensen, Warren Llewellyn, Asst. U. S. Attys., Brooklyn, N. Y., Lenore Daly, Deputy Regional Atty., Region II, U. S. E. P. A., Washington, D. C., of counsel.

Louis J. Lefkowitz, Atty. Gen. of N. Y., Albany, N. Y., for state defendants; Stanley Fishman, Asst. Atty. Gen. in Charge, Water and Air Resources Bureau, Howard A. Fromer, Deputy Asst. Atty. Gen., Olin Harper LeCompte, Asst. Atty. Gen., Albany, N. Y., of counsel.

BARTELS, District Judge.

Eight privately funded, non-profit public interest environmental organizations whose members utilize and depend upon the water resources of Nassau and Suffolk Counties ("Bi-County area"), bring this action seeking declaratory and injunctive relief against the Environmental Protection Agency ("EPA"), its Administrator, and its Regional Administrator for the New York area ("federal defendants") and the Governor of the State of New York, the New York State Department of Environmental Conservation ("DEC") and its Commissioner ("state defendants") against the funding and construction of Long Island sewage treatment facilities. The complaint charges violations of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), and the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. §§ 1251 *et seq.* ("FWPCA"), as well as the "intent of several state statutes." Jurisdiction is invoked under 28 U.S.C. § 1331, FWPCA, 33 U.S.C. § 1365(a)(2), the Administrative Procedure Act, 5 U.S.C. §§ 701–

06,[1] the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and the Mandamus and Venue Act, 28 U.S.C. § 1361.

■ The plaintiffs commenced this action in December, 1974, following the required notice under 33 U.S.C. § 1365(b) to the EPA Administrator and the State of New York, alleging a two-fold attack that in numerous respects (a) the environmental impact statement ("EIS") does not meet the requirements of NEPA, and (b) defendants failed to perform nondiscretionary acts under FWPCA and acted arbitrarily in failing to comply with the provisions of that statute. Defendants have asserted the defense of laches predicated upon the plaintiffs' delay of two years in complaining of the inadequacy of the program EIS and the failure to prepare an EIS for two treatment plants in the Bi-County area. They have failed, however, to demonstrate by any evidence that they have suffered prejudice by the delay and accordingly the court, at the outset, strikes the defense. *Cf. City of Rochester v. United States Postal Service*, 541 F.2d 967, 976–78 (2d Cir. 1976); *Steubing v. Brinegar*, 511 F.2d 489 (2d Cir. 1975). The defendants move pursuant to Fed.R.Civ.P. 56 for summary judgment,[2] and plaintiffs cross-move pursuant to Fed.R.Civ.P. 65 for a preliminary injunction. A statement of the background which has triggered the complaint is appropriate for the understanding of the environmental issues and impacts involved.

## Background

According to the Environmental Impact Statement issued in July, 1972 by EPA, the population of Nassau County between 1950 and 1960 almost doubled, growing from 673,000 to 1,300,000, and the population of Suffolk County nearly tripled, rising from 276,000 to 667,000. From 1960 to 1970 Nassau's population increased by only 10% to 1.4 million, and Suffolk's population increased by 69% to 1.1 million. EPA predicts in this statement that by the year 2020 the population of Nassau County is expected to reach 2 million, and the population of Suffolk County is expected to reach 4.7 million. This increase in population has caused an increase in the consumption of fresh water and the quantities of sewage to be disposed of on Long Island. At the present time there are several state, county and quasi-governmental agencies involved in water resources planning and management relative to Nassau and Suffolk counties. In Nassau County sewer service had been extended to more than half of the population by 1970, and in Suffolk County as of 1970 only 7% of the population was served by sewers. The rest of the Nassau and Suffolk County residents depend upon cesspools, septic tanks and other individual disposal systems for their sewage. The seepage of untreated wastewater from these cesspools and septic tanks has, by contamination, threatened the quality of underground water which serves as the sole drinking water supply. This seepage, however, has at the same time helped to maintain the level of fresh, although contaminated, ground water on Long Island.

As a solution to the problem the defendants have proposed the construction of sewage treatment facilities providing for use of ocean outfall pipes for the disposal of treated wastewater. Claiming that the problem can only be solved by the recharge to the ground water of treated wastewater, the plaintiffs object to this method of disposal.

It is admitted that in time the utilization of ocean outfalls for sewage purposes would cause a diminution of the quantity of potable ground water available. The drop in the ground water level in turn will invite the intrusion of salt water from the surrounding marine environment into the fresh water aquifers (Glacial, Magothy, and

---

1. *Cf. Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). *See* Act of Oct. 21, 1976, Pub.L. No. 94–574, § 2, 90 Stat. 2721.

2. For the sole purpose of opposing the defendants' motions for summary judgment the Long Island Sound Task Force has filed an *amicus curiae* brief.

Lloyd) to fill the void.[3] Such outfalls would also increase the salinity of the bay waters since a lowering of the ground water table would result in diminished stream flow of fresh water into the bays, which in turn would have serious adverse consequences on fish, shellfish, wildlife and other natural resources. However, the method for recharging treated wastewater to the ground water has not, according to the EPA, reached a technological stage where it can safely or practicably be employed. In view of the threat to the quantity of the fresh ground water and other adverse environmental effects, plaintiffs claim that the EPA has not considered all the required environmental impacts involved in the construction of ocean outfalls and the alternative thereto. Defendants, being compelled to make a choice, insist that while awaiting technological development for recharging treated wastewater, the only safe method of disposal for the present is through ocean outfalls.

Although there are presently twenty-seven municipal and county outfall pipes discharging an average of 110 million gallons per day ("mgd") into coastal waters of the Bi-County area and there were a total of ten wastewater treatment projects under construction at the time the EIS was issued (EIS at 1–2), the plaintiffs focus only upon the following plants which are the three largest plants in existence or presently under construction which they claim will have the greatest cumulative environmental impacts.

*The Bay Park Plant* ("Bay Park"). This facility, which provides secondary sewage treatment,[4] was constructed some twenty-three years ago and has an actual outfall flow into Reynolds Channel as high as 72 mgd. The dispute concerning Bay Park

centers upon possible funding of expansion and upgrading of the facility and the preparation of an individual environmental impact statement should such federal funding be proposed.

*The Wantagh Plant* ("Wantagh") in southeastern Nassau County. This plant, which provides secondary sewage treatment, has an initial design capacity of 45 mgd for the early 1980's with an ultimate design capacity of 120 mgd by the year 2020. It is now in operation and its treated effluent is being discharged into the ocean through an outfall pipe 13,287 feet long and 84 inches in diameter which crosses beneath the Great South Bay, over the barrier beach at Jones Beach, and into the Atlantic Ocean where the effluent is discharged at a depth of 48.5 feet beneath the ocean surface. Wantagh serves an area of 105 square miles, which in 1972 had a population of about 662,000 persons. EIS at 19. This project first received federal approval in 1968 and as of July, 1972, it was under construction. The history of federal funding and the statutes under which such grants were made for Wantagh are set forth in the appendix.

*The Southwest Sewer District Plant* ("SWSD") in Suffolk County. This facility will provide secondary wastewater treatment for an area of 57 square miles which in 1972 had a population of 240,000. At that time there existed no sewage treatment facility which served the area and sewage wastes were ultimately disposed of in the Great South Bay via ground and stream disposal. EIS at 27. SWSD has a design capacity of 30 mgd for 1985 and it will have an outfall pipe 5.49 miles long with a diameter of 72 inches, which will cross beneath the Great South Bay, over the barrier beach and terminate in the ocean

---

3. Aquifers are sub-surface water-bearing formations of porous or fractured rock, or unconsolidated gravel. There are three aquifers beneath Long Island distributed at different depths and should they become polluted, the parties agree it would take as long as 3,000 years for all of them to be flushed clean. In addition to serving as the sole source of drinking water for the Bi-County area's residents, the aquifers are also the most significant

source of fresh water for the area's bays, streams and lakes.

4. Secondary treatment removes certain contaminants to minimum levels, see 40 C.F.R. Pt. 133 (1976), but does not treat other contaminants such as viruses, nitrates, phosphates, heavy metals and pesticides which may be found in domestic sewage.

after being buried in a trench 2.5 miles in length at a depth of 52 feet beneath the ocean surface. Federal funding for the SWSD was approved in 1971, the details of which are set forth in the appendix.

The parties agree that the State since 1970 has required that all publicly owned sewage treatment facilities, including SWSD, built or designed in the Bi-County area be constructed in a modular fashion so as to allow for the addition of advanced wastewater treatment equipment which could be utilized with recharge of treated wastewater to the ground water.

### National Environmental Policy Act

This court unquestionably has jurisdiction of the controversy under FWPCA which in turn mandates the application of NEPA to federal funding of publicly owned water treatment works. FWPCA §§ 505(a), 511(c)(1). *See* Senate Comm. on Public Works, 93d Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendments of 1972, at 182 (Comm. Print 1973) (hereinafter cited as "Legislative History"). The purpose of the legislation is made clear in sections 2 and 101 of NEPA, which declare the national policy to be the promotion of efforts by all practicable means to prevent or eliminate damage to the environment and to create conditions whereby man and nature can exist in productive harmony for present and future generations. Subsection 102(2)(D) of NEPA requires all federal agencies specifically to study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. Subsection 102(2)(C) requires the preparation of a detailed environmental impact statement by all federal agencies on the significant impacts of every proposal for major federal action affecting the quality of the human environment and it mandates consideration of five specific factors.[5] As pointed out in *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1113 (1971), there will be conflicts among competing considerations but the conflicts should be identified and balanced by the agency, and a recommendation disclosed in the EIS. *See Flint Ridge Dev. Co. v. Scenic Rivers Ass'n,* 426 U.S. 776, 787, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976); *Natural Resources Defense Council, Inc. v. Callaway,* 524 F.2d 79, 92 (2d Cir. 1975); 40 C.F.R. Pt. 1500 (1976).[6] The statute forces consideration of environmental factors but it "does not require specific results in particular situations." *Chelsea Neighborhood Ass'ns v. United States Postal Service,* 516 F.2d 378, 384 (2d Cir. 1975). The kind of environmental impact statement required depends upon the type of " 'federal action' being taken." *Aberdeen & Rockfish R. Co. v. SCRAP (SCRAP II),* 422 U.S. 289, 322, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975). The procedural requirements must be observed "to the fullest extent possible." Section 101(b) requires agencies "to use all practicable means, consistent with other essential considerations of national policy," to protect environmental values. NEPA is, "at the very least, 'an environmental full disclosure law,' . . . for agency decision makers and the general public." *Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693, 697 (2d Cir. 1972).

---

**5.** These factors are as follows:

"(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

**6.** The objective of § 102(2)(C) and of the pertinent regulations promulgated in support thereof is to require "agencies to build into their decisionmaking process, beginning at the earliest possible point, an appropriate and careful consideration of the environmental aspects of proposed action in order that adverse environmental effects may be avoided or minimized and environmental quality previously lost may be restored." 40 C.F.R. § 1500.1(a) (1976).

*The Environmental Impact Statement*

In June of 1971, EDF petitioned EPA to prepare individual and overall NEPA statements with respect to the Long Island sewage treatment facilities to be funded by the federal government. In December of 1971 the local Regional Administrator of EPA issued a draft "Environmental Impact Statement on Waste Water Treatment Facilities Construction Grants for Nassau and Suffolk Counties, New York" and the final statement was issued in July of 1972 and approved and adopted by EPA in August of 1972 as required by § 102(2)(C) of NEPA. During the period between the draft and final EIS, public hearings were held on Long Island and interested persons and organizations submitted reviews and criticisms of the draft. In the EIS the EPA reached the following conclusions and recommendations:

### CONCLUSIONS

1. The construction and operation of collection systems and effective wastewater treatment facilities are essential to the protection of Long Island's water supply.

2. As soon as the technology is demonstrated, it would be advantageous for Long Island to implement groundwater recharge for the optimum utilization of its water resources.

3. A concerted effort must be made to preserve the remaining marshland habitat.

4. Water resource planning and management programs for all of Long Island must be implemented to insure both effective and efficient utilization of available water resources. At the present time, the interim metropolitan and basin plans required by Federal regulations are necessarily limited to the effects of specific treatment plants and ancillary equipment. It is imperative that the planning and management program for all of Long Island be completed as expeditiously as possible for inclusion in fully developed plans by July 1, 1973.

5. Maximum utilization of available water resources necessitates the use of a combined system of groundwater recharge and ocean discharge of treated wastewater. Ocean outfalls are required backup facilities for ground-water recharge because of the problems associated with plant failure. *Until such time as the technology for wastewater treatment and recharge has been both fully developed and implemented, disposal of all treated effluent to the ocean is the only feasible alternative.* [Emphasis added.]

### RECOMMENDATIONS

1. Proceed, as expeditiously as possible with the construction and operation of properly designed collection, treatment and disposal facilities in accordance with the principles embodied in this environmental impact statement.

2. As soon as the results of the EPA-sponsored Wantagh feasibility study are known, a full-scale (about 5 mgd) project should be undertaken to demonstrate the reliability and consistent attainment of high levels of treatment, including nitrogen removal, and ground-water recharge of treated wastewater.

3. The construction of wastewater treatment facilities should not utilize marshlands.

4. To insure that growth is consistent with the maintenance of environmental quality, planning for Nassau and Suffolk Counties should include:

a) the accurate determination of both the population levels and the industrial wasteloads that can be supported by available natural resources, and

b) the development of controls to insure that domestic and industrial wasteloads do not exceed the environment's capacity to support them.

The New York State Department of Environmental Conservation should exercise its functions on Long Island to promote and coordinate management of water, land and air resources to as-

sure their protection, enhancement, provision, allocation and balanced utilization consistent with the environmental policy of the State.

5. It is recommended that a combined system of ground-water recharge and ocean discharge be developed for the disposal of treated wastewater. Investigations to determine which areas require ground-water recharge and the optimum methods of recharge for the affected areas should be actively pursued. Until such time as the technology has been fully demonstrated and recharge has been implemented, it is recommended that ocean outfalls be utilized as the only feasible alternative.

EIS at 254–56.[7]

■ In reviewing the adequacy of the EIS the court must decide whether the agency's consideration of the factors listed in NEPA § 102(2)(C) was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of the procedure required by law. *Chelsea Neighborhood Ass'ns v. United States Postal Service, supra,* 516 F.2d at 387 n. 23; *Hanly v. Kleindienst (Hanly II),* 471 F.2d 823, 828–30 (2d Cir. 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).[8] As stated in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), even though there is no *de novo* review or requirement that the agency's action meets the substantial evidence test, there remains a "thorough, probing, in-depth review" to be undertaken by the court. *Id.* at 415, 91 S.Ct. 814. The court must determine whether the decisionmaker acted within the scope of his authority, and further, though "the court is not empowered to substitute its judgment for that of the agency," it must decide whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 824.

### The Complaint

■ Plaintiffs have cast their complaint in the form of twenty claims for relief, four under the heading of NEPA and sixteen under the heading of FWPCA, many of which include numerous independent subclaims. For example, the first NEPA claim contains twelve subclaims and the second NEPA claim contains twenty-two subclaims. A substantial number of the claims under both NEPA and FWPCA are simply repetitions or variations of the same theme as violating both Acts. In order to give proper attention to all the claims some repetition is necessary but as far as possible the court has limited its consideration only to those claims of substance. In their first NEPA claim the plaintiffs have subjected the EIS to a microscopic examination and dissection and complain of the inadequacies of the disclosures, analysis, impacts, and the alternatives set forth therein. After carefully addressing the NEPA claims, the court concludes that the defendants have complied, with one exception, to the fullest extent possible with the NEPA mandates as

---

7. The final EIS in this case is a document of 314 pages and contains (1) a summary; (2) an overview (18 pages); (3) a description of the pertinent projects (5 pages); (4) a descriptive background of geographic, demographic and hydrologic characteristics of Long Island and its surrounding waters (57 pages); (5) the environmental impacts of the projects (17 pages); (6) adverse environmental impacts which cannot be avoided (3 pages); (7) alternatives to the projects (66 pages); (8) the relationship between local short-term uses of the environment and the enhancement of long-term productivity (2 pages); (9) irreversible or irretrievable commitments of resources involved in implementing the projects (2 pages); (10) a discussion of the problems raised by those who commented upon the draft EIS (61 pages); (11) conclusions and recommendations, a bibliography and appendices (60 pages).

8. *Cf.* Leventhal, *Environmental Decisionmaking and the Role of the Courts,* 122 U.Pa.L.Rev. 509, 540–41 (1974). The court's role is not "limited to the mechanical assurance that the file contains a document neatly tied up in ribbons and captioned 'impact statement.'" *Id.* at 525. *See also* Note, *Program Environmental Impact Statements: Review and Remedies,* 75 Mich.L.Rev. 107, 127–30 (1976); F. Anderson, *NEPA in the Courts* 23–26 (1973).

appears from a seriatim discussion of each claim and subclaim of substance[9] in the order stated in the complaint.

### Alleged EIS Inadequacies
#### a. Hydrologic Impacts

Plaintiffs assert that the EIS fails to make and disclose quantitative estimates of the cumulative hydrologic impacts of the outfall sewering program on all of the water resources of the Bi-County area under both average and stress drought conditions. They point out that throughout much of Nassau and western Suffolk counties the Wantagh and SWSD disposal systems will cause a drawdown ranging from 1½ to 20 feet in the water table which will cause a reduction in average annual stream flow of from 35 to 40 percent within five to ten years and will cause a reduction of subsurface outflow to the Great South Bay of an as yet undetermined amount. Plaintiffs assert that such estimates are necessary and critical to evaluate the impacts of the program on fish, wildlife, and the salinity of the Great South Bay.

Upon this subject EPA was advised by the United States Geological Survey that there were not sufficient technological data available to make accurate or meaningful predictions of the extent of water drawdown. The EIS acknowledges that it can-

not answer the question of when it will be necessary to recharge the ground water supply with wastewater effluents in order to maintain stream and lake levels, to maintain specified positions of the fresh/salt water interfaces, and to maintain a supply of potable ground water. EIS at 237. It admits that definitive quantitative answers will have to await results of present and forthcoming studies. EIS at 242. After describing the ground water conditions of Long Island, the statement explains the physical movements of water under, on and around Long Island and the estimated volume of fresh ground water. EIS Table 34. It states that the average annual recharge to the ground water reservoir is 80 mgd from the water runoff of urban areas into recharge basins, and it further admits that evidence has been found that the loss of recharge in southeastern Nassau resulting from increased direct runoff has caused a decline of 1–2 feet in the average ground water level.[10]

The EIS does in fact contain hydrologic data. It refers to salt water intrusion and stream flow, including information pertaining to the drought conditions of the early 1960's and the effects of sewering in southeastern Nassau County. EIS at 51, 88, 97, 128–29, 191, 205, 210.[11] It does not, how-

---

**9.** Plaintiffs' first subclaim is that the EIS is inadequate because it fails to define the set of "environmental objectives" to be achieved by the sewering program. Obviously, there is no need to parrot in the EIS the language of the statutes setting forth in detail congressional goals, policies and objectives. See NEPA §§ 2 & 101; FWPCA §§ 101 & 201. Therefore we do not believe this claim to be of substance. In fact, the EIS does contain in several places in addition to the conclusions and recommendations quoted *supra,* the specific objectives sought by implementation of the outfall sewering program. EIS at vii, 17, 95, 127–28, 131, 135, 143, 234, 251, 253. At pages 137–38 the EIS contains an explanation of the reasoning behind EPA's position as to the most prudent and feasible course of action.

**10.** "Unquestionably, certain areas of Nassau and Suffolk Counties could benefit from immediate implementation of ground-water recharge. The subject of water-management becomes appropriate at this point in the discussion. One of the primary goals of water-re-

sources planning on Long Island is to provide sufficient water of suitable quality to meet the needs of Long Island's residents.

The major features of present water-resources development are: (1) withdrawal of ground water from both the shallow unconfined aquifers and from the deeper confined aquifers, (2) artificial recharge of polluted wastewater through cesspools and septic tanks, (3) injection of relatively uncontaminated wastewater through diffusion wells, (4) artificial recharge of direct-runoff water through shallow basins, and (5) discharge of treated wastewater into the sea. As a result of these water-management practices, total fresh-water outflow from the ground-water reservoir within the water-budget area is greater than total fresh-water inflow. Consequently, the amount of fresh ground water in storage is decreasing." EIS at 248–49.

**11.** The EIS at pages 98–99 quotes from several researchers who state that it is difficult to delineate the exact position of wedges of salt

ever, contain predictive data or extrapolations from that data presented as to the expected quantitative impacts of outfall sewering on the Bi-County's hydrologic system.

■ Although the NEPA process requires that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action, *Natural Resources Defense Council, Inc. v. Callaway, supra,* 524 F.2d at 92, it does not impose a requirement of perfection nor does it require that all environmental impacts be known. There is a recognition that the EIS by its very nature comes before, and not after the actions to be evaluated have taken place. *Cady v. Morton,* 527 F.2d 786, 796 (9th Cir. 1975); *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275, 1280 & n.11 (9th Cir. 1973); *Movement Against Destruction v. Trainor,* 400 F.Supp. 533, 552 (D.Md.1975); *Environmental Defense Fund, Inc. v. Corps of Engineers,* 348 F.Supp. 916, 927 (N.D. Miss.1972), *aff'd,* 492 F.2d 1123 (5th Cir. 1974).

■ At most, plaintiffs assert that EPA should have provided "rough" estimates of the hydrologic impacts. There can be no dispute that these impacts are among the most significant factors to be considered by the decisionmaker, but the court cannot

conclude that the absence of such detailed, but "rough" information is fatal in light of the information which the EIS does contain. The court finds as a matter of law that that data and the discussion upon this subject contained in the EIS are sufficient.[12]

### b. *Fish, Wildlife, Recreation: Streams, Bays and Ocean*

One of the more serious complaints by the plaintiffs among the many charges of deficiencies in the EIS is that the statement does not adequately describe and quantify the potential adverse effects of the sewering program on surface stream recreational amenities, fish and wildlife resources, and the potential risks of serious damage to the shellfish and finfish industries. In support of this charge plaintiffs refer to the comments of the Fish and Wildlife Service of the U.S. Department of the Interior concerning the draft EIS, stating that there is no mention of the expected impact on fish, wildlife, and other natural resources. Plaintiffs emphasize the importance of the fishing and other recreational uses of the area's surface waters, adding that the $100 million per year shellfish industry may be jeopardized by an increase in salinity in the Great South Bay, thus decreasing productivity of the clam beds. However, EPA did consider this subject as appears from the eight specific findings in the margin,[13] and

water which have moved landward, but that the wedges are moving at less than 10 to 20 feet per year.

12. The dire predictions made by plaintiffs are based upon a flow capacity of the Wantagh and SWSD plants which will not be achieved until the early and mid-1980's at the earliest. As concluded in the EIS, outfall sewering is only a temporary, albeit necessary, solution and therefore it is fair to assume that only temporary hydrologic impacts of the nature complained of by plaintiffs will result from it, if they result at all.

13. (1) The Great South Bay is a popular commercial and sport fishing area, which provides exceedingly important industries (EIS at 6–7, 61); Great South Bay sports fishing expenditures exceeded $5 million in 1968 and the economic impact of sports fishing on Long Island's economy is estimated to be in excess of $100 million annually. (EIS at 85).

(2) A lowering of the water table and resulting salt water intrusion into the aquifers could destroy the streams and water table lakes of Long Island. (EIS at 12). On the other hand, a failure to collect wastewater will cause deterioration of the fresh and estuarine surface water ecosystems because of the flow of contaminated ground water into those areas. (EIS at 15–16).

(3) The surface water bodies are used extensively for recreational purposes (EIS at 53, 62), including use each year by more than 2 million bird watchers and wildlife photographers. (EIS at 86).

(4) The marsh and water areas of the bays are important feeding and nesting habitat for migrating and wintering waterfowl and shore birds of which there are more than 80 species, and thousands of shore and songbirds depend on the shallow waters and marsh for food, nesting cover and shelter. (*Id.*).

(5) Approximately 10 percent of the bay water shellfish beds which include clams, oysters, bay

**992**

the only deficiency which we find is in respect to the magnitude of the injury to the shellfish industry.

The EIS refers to the Wantagh outfall and its construction in particular, and includes the effects of both on fish and clams and on shrubs, trees, rabbits, songbirds, gulls and terns where the pipe crosses land. EIS at 107–09, 110. At the same time the effect on ocean productivity of the outfall flow upon shellfish and bay salinity and upon stream flow and water table lakes is also discussed but not sufficiently. EIS at 115–17, 118, 121.

The EIS asserts that polluted fresh water input resulting from pollution of the aquifers by individual waste disposal systems has a negative impact upon the estuarine [14] ecosystem as would the alternative discussed of discharging treated effluent into the bays of Long Island. EIS at 127–29, 142. Among the short-term uses or environmental effects associated with the long-term benefits predicted in the EIS as a result of outfall sewering on Long Island rather than cesspool disposal are improvement of bay water quality resulting from cleaner ground water, the potential for opening of more shellfish beds, and the creation of more sites for recreational uses. EIS at 189. EPA asserts in the EIS that the discussion therein provided reflected the best information available, and that while the agency sought additional information from responsible agencies, no significant material was obtained. It admits that research remains to be done in many such areas. EIS at 206, 208.

In criticism of the EIS the plaintiffs have submitted an affidavit dated October 2,

1975, of Stephen G. Lane, Vice-President of Bluepoints Co., Inc. (the largest shellfish company on Long Island), President of the Long Island Shellfish Farmers Ass'n and President of the Regional Advisory Council for the New York State Department of Environmental Conservation. He outlined in detail the potential harm to the shellfish industry from an increase in salinity of the Great South Bay, pointing out that the shellfish industry employs 12,000 people and is the second largest industry on Long Island with a gross value in excess of $100 million per year. He stated that 40 percent of the hard shell clams harvested in the United States each year come from the Great South Bay and that this represents a significant portion of the total value of all commercial fishing in New York State; that the use of ocean outfalls will reduce fresh water discharges into the Great South Bay by lowering of the water table, which in turn will increase the bay salinity which is the most important water quality parameter for the production of shellfish. Among other charges, Stephen Lane affirms that if the salinities were to increase beyond the present levels, hard shell clam spawning and larval survival will be seriously affected and that now "the bay is in a precarious balance." He also refers to the detrimental effect on the shellfish industry caused by the drought period on Long Island during the 1960's citing at the same time the results of a United States Geological Survey electrical analog model which reveals that total average stream flows in the Wantagh and SWSD areas will be reduced by 26 percent by 1980 and almost 40 percent by 1985. He concludes that the EIS does not quantify the effect of salinity changes on

scallops, and mussels, have been closed to shellfishing as a result of direct pollution (EIS at 84–85), and the oysters have been especially hard hit by pollution. (*Id.*).

(6) Hempstead, South Oyster and Great South Bays provide feeding, breeding or nursery habitat for winter flounder, summer flounder, bluefish, striped bass, and other finfish, and the tidal ponds and channels provide a habitat for bait fish (EIS at 85); and it is difficult to determine the value to commercial and sports fishing that the bays have upon immature stages of oceanic finfish species. (*Id.*).

(7) High productivity and fertility of estuaries for both fresh and marine water species and data as to pollution have been described in general terms. (EIS at 81–82, 104).

(8) Finally, the health standards for shellfishing and an evaluation of the presence and effect of microscopic algae on shellfishing are set forth. (EIS at 81–82). *See also* EIS at 61, 68, 102–03, 192.

14. Estuaries are defined as semi-enclosed, coastal water bodies within which sea water is diluted with fresh water.

the shellfish industry or assess the cumulative benefits and costs of outfall sewering upon the industry.

 While this and other information may not have been available to the EPA when the EIS was issued in 1972, it seems apparent that such information is now available. Consequently, the effect of outfall sewering upon the shellfish industry can and must be more specifically stated in a supplemental impact statement in order to assure that the decisionmaker may properly analyze and consider all of the significant effects on the environment of outfall sewering. Of course, the EIS speaks as of the date of its issue and the fact that there are some effects which were then unknown does not make the statement inadequate. *Cady v. Morton, supra,* 527 F.2d at 796; *Jicarilla Apache Tribe of Indians v. Morton, supra,* 471 F.2d at 1280 & n.11. However, when an information gap of this importance exists and there is not sufficient information in the statement to permit even an educated guess as to the magnitude of the injury to the shellfish industry, we believe that NEPA requires the agency to take a harder look at this particular environmental problem since there is a credible basis for finding that the gap may now be filled. *Cf. Citizens Against Toxic Sprays, Inc. v. Bergland,* 428 F.Supp. 908 (D.Or.1977); *City of Romulus v. County of Wayne,* 392 F.Supp. 578, 588 (E.D.Mich.1975); Council on Environmental Quality Guidelines, 40 C.F.R. § 1500.11(b) (1976). At all events, since the outfall sewering under consideration may be modified or changed in the future depending upon technological advances, it would be meaningful to have immediately available an assessment of the magnitude of the injury to the shellfish industry for the purpose of a new evaluation of the project as advances are made in scientific methods for the recharge of ground water.[15]

15. The EIS "is not an end, but a guide for future action and decisionmaking by EPA. Since 1972, EPA has continued to study and evaluate the areas of concern identified" in the

### c. *Economic Analysis*

Plaintiffs claim that the EIS is inadequate because it contains no comprehensive economic analysis of the outfall sewering program, such as engineering and operation cost data for specific alternative systems, and also environmental and secondary economic costs associated with those alternatives.

Section 102(2)(B) of NEPA requires the development of methods and procedures to insure that "presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." NEPA invokes a balancing process by the agency of competing considerations; a "broadly defined cost-benefit analysis of major federal activities." *Chelsea Neighborhood Ass'ns v. United States Postal Service, supra,* 516 F.2d at 386. The statute does not require a "formal and mathematically expressed cost-benefit analysis," since the valuations would be subjective and the final decision is not a strictly mathematical determination. *Trout Unlimited v. Morton,* 509 F.2d 1276, 1286 (9th Cir. 1974). *See also Sierra Club v. Stamm,* 507 F.2d 788, 794 (10th Cir. 1974); Note, *The Federal Water Pollution Control Act Amendments of 1972: Ambiguity as a Control Device,* 10 Harv.J.Legis. 565, 587 (1973).

 We find no requirement in NEPA for the placement of dollar values on environmental impacts; consequently, we need only determine whether the EIS adequately identified and evaluated the predicted results of each of the alternatives. Nevertheless, the EIS does contain some monetary cost discussion of alternatives and their impacts, EIS at 16, 85, 132, 134, 145–46, 164–66, 177–78, 182–88, 203–04, and also discussions of non-costed factors. We conclude that the economic data presented are sufficient to permit the decisionmaker to act, as are the evaluations of the advantages and

EIS. Affidavit of Gerald M. Hansler, P.E., Regional Administrator of Region II, EPA, ¶ 10 (Nov. 17, 1975).

**994**

disadvantages of each of the alternatives with the exception of the economic treatment of the shellfish industry.

### d. Public Health Hazards of Outfalls

Plaintiffs complain that the discharge through outfalls of large quantities of viruses constitutes a public health problem in the Great South Bay and in nearby bathing waters which has not, but should have been evaluated in the EIS. In order to evaluate properly this claim, we must at the same time examine the public health hazards of the alternative of recharging treated wastewater to the ground water. The EIS shows that the decisionmaker considered the public health hazards of both recharge and outfall sewering and made an informed decision between the two alternatives.

 *Recharge.* In referring to contamination resulting from the recharge process, the EIS concluded:

"If wastewater is to be domestically reused, there must be an effective means of virus removal. Enteric viruses have been detected in domestic sewage and in all phases of sewage treatment including final effluent. . . . Infection via the water route must be considered if viruses isolated from water are capable of infection when ingested. Although waterborne infectious hepatitis and viral gastroenteritis have not been conclusively proven, much evidence exists to suggest that water can be a vehicle for viral infection.

⸱ ⸱ ⸱ ⸱ ⸱

The lack of suitable techniques for detection, identification and enumeration of viruses in water prohibits a direct approach to water quality control. . . . At this time, the agent responsible for infectious hepatitis cannot be isolated in the laboratory. . . ." EIS at 175, and further

"At this time, the inadequacies which exist in viral detection and quantitation

techniques make monitoring unreliable as a safeguard. Questions exist concerning the potential long-term medical effects of ingesting compounds present in sewage. Although it is technically possible to renovate wastewater for any use, the American Water Works Association (AWWA) recommends against direct reuse until the above mentioned inadequacies are rectified. The AWWA recommends a 'natural' separation in time and space between wastewater treatment discharge and potable supply intake. We concur with the AWWA in not recommending direct reuse at this time." EIS at 135.

The impact statement acknowledges that further research into the composition of sewage is necessary before its potential environmental impact can be understood, EIS at 115, 210, and further, it states that should there be a continuation of "unsewered conditions," then "the danger of accidental infection, particularly to children could become substantial, irrespective of the quality of drinking water supplies. Quite aside from serious questions about the practicality of water supply mechanisms as well as possible ecological effects, these proposed schemes entail a potentially large risk to public health." EIS at 131.[16]

From the above, the court is convinced that the EIS presents sufficient authority for its conclusion that it is unwise at the present time and potentially dangerous to close the drinking water cycle so that people will ingest water containing viruses and other materials of unknown quantity and effect from wastewater.

*Outfall Sewering.* The EIS admits that the ocean cannot be considered an "infinite sink" for disposal of all our wastes, but advocates, at least for the time being, outfall disposal of wastewater from Long Island treatment plants as the least undesirable alternative since the ocean is capable

---

**16.** In connection with the recharge alternatives the EIS evaluates injection wells, EIS at 39–45, and land treatment and spray irrigation, EIS at 213–37, and both the technological problems in general of these approaches and the feasibility

of their application specifically on Long Island. The difficulties involving land treatment and viruses are discussed in the EIS at 225, 235. *See also* EIS at 10, 21, 117–33, 157.

of assimilating pollutants which other disposal sites cannot. EIS at 117, 133, Table 26.

It discusses the possibility of contamination of ocean waters by pollution discharge, and water quality at present outfall sites, EIS at vii, 54, 78, and it traces the flow of currents off the shores of Long Island, including Jones Beach and Long Beach, which indicates that public health risks will be ameliorated. EIS at 53–54. There is a mixing flow of waters between the south shore bays and the ocean and during the summer months there may be a cleansing action of near-shore waters by waters further off-shore. EIS at 56, 75–76. The EIS also reviews the bacteria counts and viral activity in the open ocean, in Long Island Sound and its bays, in Hempstead Bay, and that expected at the future outfall sites. EIS at 6, 61–62, 82, 114, 140, Tables 13, 15 & 19. Though it does not specifically discuss the adverse public health aspects in general resulting from the use of ocean outfalls, it clearly appears that it has given this subject sufficient consideration to provide a balancing of the two alternatives of disposing of effluents. *See* EIS at 137, 181, 212. Indeed, the EIS concludes:

"The capability to produce treated wastewater effluent of an acceptable quality for ground-water recharge on Long Island does not now exist. Therefore, the prudent course is to proceed with ocean or Sound disposal of secondary treated wastewater while making provisions to implement ground-water recharge as soon as it becomes feasible. Ground-water recharge of treated wastewater effluent should commence as soon as recharge goals have been delineated and optimal methods of wastewater treatment and recharge have been developed and implemented." EIS at 136.

e. *Nitrate Contamination of (Upper) Glacial Aquifer*

 Plaintiffs further claim that the EIS is inadequate in that it fails to disclose how and in what respects nitrate contamination in parts of the Glacial Aquifer requires, justifies, or will be remedied by immediate outfall sewering. They explain in their memorandum of law that the EIS has failed to balance the costs in terms of additional damage to water quality of delaying the outfall program against the benefits of delay until a comprehensive water resource plan is developed to provide the best long run water quality management solution. They assert that the EIS, though addressing the alternative of taking no action, neglects to discuss taking no action for a limited period until a comprehensive plan can be developed and recharge technology perfected.

A review of the EIS reveals no deficiency in this area. The EIS concludes that ocean outfalls will be necessary even if large-scale recharge is implemented, as a backup for malfunction in the recharge system since Long Island must have some outlet for its treated effluents. EIS at 136. Therefore, there is no infirmity in failing to discuss the option, in *haec verba*, of a short period of "no action" as opposed to discussing "no action" at all as an alternative along with various methods of wastewater treatment.[17]

There are now areas of Long Island where the drinking water is drawn from the Glacial Aquifer and effluents are disposed of via cesspools to the Glacial Aquifer. The net result of such activities is maintenance of water quantity but deterioration of water quality. EIS at 243. It is estimated that in 1966, 30 percent of the artificial recharge to the ground water reservoir on Long Island resulted from cesspools and septic tanks and nitrogen is present in sewage effluent as ammonia, amino acids, nitrate and nitrite. EIS at 92, 114.

The impact statement explains that constituents of sewage origin in the ground water of Long Island that are of special

---

**17.** Plaintiffs in another context have made the same claim for delay elsewhere in the complaint, asserting that the EIS has failed to analyze the alternative of delaying the outfall sewering program until a comprehensive plan for the area's wastewater needs is developed. We repeat our rejection of this claim. *See also* EIS at 127–30, 137–38, 254–56.

concern are methylene blue active substances ("MBAS") and that these substances indicate the presence of detergents and compounds of nitrogen. It states that in the southern two-thirds of Nassau County in the late 1960's and early 1970's MBAS were widely distributed in water in the upper Glacial Aquifer in concentrations greater than the recommended limit, and that further, when sanitary-sewer facilities of Suffolk County are completed and fully operational, the source of virtually all the MBAS contamination in the ground and surface water of Suffolk County will be eliminated. EIS at 94–95. The EIS further quotes from studies clearly indicating that nitrate-enriched water from the upper Glacial Aquifer has seeped down through the full thickness of the Magothy Aquifer in parts of central Nassau County and forms a major water body having a nitrate content ranging from 1 to 94 mg/liter, and further, that substantial quantities of water in the upper Glacial Aquifer, both in sewered and unsewered areas, have a nitrate content exceeding the recommended limit for drinking water. EIS at 95–96.

The statement concludes that nitrogen removal is a necessity for potable water and evaluates the feasibility and effectiveness of removing the same by treatment methods other than ocean discharge. EIS at 135, 159–73, 183–84, Tables 24, 28, 30 & 31. It is beyond question that the outfall will remove the source of nitrate contamination and plaintiffs' only objection apparently is to the necessity for resorting to immediate outfall sewering. Under the circumstances we find this objection unjustified. EIS at 130–31, 189.[18]

### f. Geological Conditions Affecting SWSD Coastal Waters

Another complaint by the plaintiffs is that the EIS is inadequate in its failure to discuss and analyze the unusual geological conditions beneath the coastal waters off the south shore of Long Island as affecting the physical integrity of the SWSD outfall pipe. While this complaint was premature at the time made because the SWSD outfall route had not yet been selected or approved, the EIS did discuss in general terms the depth of the ocean floor, the currents, and the chemical and physical properties of the coastal waters. EIS at 103–10. Since the filing of the complaint the Administrator has approved the SWSD outfall route and issued an Environmental Impact Appraisal ("EIA") on the project in support of his decision not to prepare an individual EIS for the SWSD outfall. In response to comments received from plaintiffs and others on the EIA that the pipeline may be unstable and that the EIA neglected to detail construction plans for the pipeline, the EPA responded:

"The ocean outfall segment has been shortened to 2.5 miles in length, and therefore it will not reach the ridge and swale zone or be exposed to any potentially hazardous conditions in this area." (Response no. 9).

And further:

"The average depth of burial beyond the thirty-foot contour will be four feet; the design life is approximately 100 years. It was necessary to entrench the entire outfall in order to protect it from potential damage by fishing trawler 'doors' and the potential erosion and accretion of bottom sediments." (Response no. 13).

### g. Alternatives to Outfall Sewering Program

Plaintiffs charge that the program EIS does not adequately discuss the question of water recharge and its conservation alternatives as set forth in paragraph 102 of the complaint. In paragraph 102 plaintiffs

18. Another related inadequacy charged by the plaintiffs is that the EIS fails to disclose that an ocean outfall constitutes an uncontrolled scientific experiment. This is inaccurate. The EIS sets forth the expected results of outfall discharge on the surrounding environment based upon previously reported research which is included in the bibliography to the statement. EIS at 111–19, 160, 264, 270, 271. This is not the first time that ocean outfalls have been used for the disposal of treated wastewater. See, e. g., City of North Miami v. Train, 377 F.Supp. 1264 (S.D.Fla.1974).

have set forth fifteen possible alternatives contained in three subcategories: (1) various recharge treatment methods; (2) various water conservation and recycling methods; and (3) various land use controls.[19] The impact statement clearly discusses and evaluates all the alternatives in the first two categories with the exception of improved management of recharge basins to assure high quality percolate, and use of small plants and collection systems more suitable for recharge purposes, which exceptions are insignificant in the present context. EIS at viii, ix, 12–17, 39–45, 125–26, 129–34, 143–88, 202–03, 208–210, 213–37. There is discussion of recharge basins and there is no indication by plaintiffs that the use of small collection systems is a feasible alternative. EIS at 143–46, 229–36.

 As to the third category, land use control, the impact statement does not follow the subdivisions or areas of discussion as set forth in the complaint. While there is no discussion *per se* of the control of sanitary land fill, highway, parking lot and shopping center development, or of acquisition of land for recharge, we believe the

discussion in the EIS of land use alternatives is sufficient and that we need not pursue the plaintiffs' fractionating process to the "brink of triviality." *Cady v. Morton, supra*, 527 F.2d at 797. EIS at viii, 11–17, 123–27, 255. Accordingly, we find no deficiencies as to the discussion of alternatives as required by section 102(2)(C)(iii) of NEPA.[20] This concludes the plaintiffs' charges in their comprehensive, first NEPA claim.

*Omnibus NEPA Violations*

In their second claim plaintiffs allege that the federal defendants' decision to proceed with outfall sewering was arbitrary and capricious in violation of sections 101 and 102 of NEPA. They predicate this claim upon the alleged failure to fulfill planning and research commitments in the Bi-County area. In paragraph 109 of the complaint they specify twenty-two subclaims which we believe are based upon the plaintiffs' misapprehension of both the facts and the law or which are dealt with elsewhere herein, or which are frivolous.[21]

19. "(a) The various recharge treatment materials include: (1) The use of land application systems which recharge waste-water into the aquifer, remove nutrients and other contaminants through vegetation and soil action and use the nutrients as a fertilizer resource to grow economically valuable surface crops; (2) Advanced waste treatment, including biological denitrification and recharge in recharge basins or shallow pools; (3) Improved management of recharge basins to assure a high quality percolate; (4) Improved individual home treatment units capable of denitrification; (5) Treatment of ground water at the well-head; (6) The use of small collection systems and plants more suitable for recharge purposes.

(b) The various water conservation and recycling methods include: (1) Use of water saving devices in new and existing homes; (2) Use of dual plumbing systems; (3) The development and use of in-house water recycling systems; (4) The use of peak consumption and nondeclining block water rates to lower water demands.

(c) The various land use control alternatives include: (1) Acquisition or control of undeveloped land which is hydrologically suitable for land application treatment and recharge; (2) Preservation of undeveloped natural recharge areas; (3) Preservation of high quality fresh water recharge areas to serve as an alternate

source of water for human consumption; (4) Standards for and control of development which properly reflect the goal of conservation of water resources and need for suitable land for recharge; (5) Control of highway, parking lot and shopping center development which can obstruct natural recharge and constitute important non-point sources of pollution; (6) Control of the use of sanitary land fill sites."

20. The plaintiffs further charge an EIS inadequacy in that it does not evaluate the long term costs of developing an alternate water supply to replace the aquifers which will be depleted, and also contaminated by salt water intrusion. In fact, two alternatives considered in the statement involve importation of potable water from outside Long Island, but both were rejected because such a supply was unavailable. EIS at 132, 133. There is no need to discuss alternatives which are not feasible or reasonable. *Cummington Preservation Comm. v. FAA*, 524 F.2d 241 (1st Cir. 1975); *Carolina Environmental Study Group v. United States*, 166 U.S. App.D.C. 416, 510 F.2d 796 (1975).

21. The twenty-two subclaims contained in paragraph 109 of the complaint fit into the following three categories: (1) *Factually inaccurate or Legally unsupportable*: 109(b), 109(d), 109(f), 109(h), 109(j), 109(k), 109(*l*),

### Separate EIS for SWSD

In their third claim the plaintiffs charge the defendants with the failure to prepare a detailed environmental impact statement with respect to the SWSD outfall sewering program, in violation of section 102(2)(C) of NEPA, based primarily upon likely ruptures and the cumulative effect of SWSD with other outfalls.[22] The gist of their complaint is that the program EIS does not evaluate the environmental impacts of the SWSD project separately since the descriptions in the EIS relate only to the Wantagh outfall, ignoring completely that the evaluation of the outfall concept applies equally to Wantagh and the SWSD project.[23]

■ Subsequent to the issuance of the EIS the defendants approved a specific route for the SWSD outfall, and the Administrator decided that no individual EIS is necessary for the SWSD outfall. Accordingly, he issued a negative declaration and an Environmental Impact Appraisal in support of his decision, with respect to which comments were received including several from the plaintiffs. 40 C.F.R. § 6.212 (1976). After review thereof, we conclude that the federal defendants were not arbitrary or capricious in deciding not to prepare an EIS for SWSD. *See* 40 C.F.R.

§ 1500.6(d)(1) (1976); *Natural Resources Defense Council, Inc. v. Morton*, 388 F.Supp. 829, 838–41 (D.D.C.1974), aff'd, 174 U.S.App.D.C. 77, 527 F.2d 1386, *cert. denied*, 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976); *Committee to Stop Route 7 v. Volpe*, 346 F.Supp. 731, 740–41 (D.Conn. 1972).

### Separate EIS for Bay Park

■ Plaintiffs' fourth claim is that the federal defendants have violated section 102(2)(C) of NEPA in their failure to prepare an EIS with respect to the alleged plan of the state and federal defendants to expand and upgrade the Bay Park treatment plant and outfall. This charge is rejected as premature.

Federal funding of waste treatment works proceeds in three distinct steps: (1) the preparation by the grant applicant of facilities plans and related elements; (2) the preparation by the applicant of construction drawings and specifications; and (3) the fabrication and building of a treatment works. 40 C.F.R. § 35.903 (1976). Generally, there must be full compliance with the facilities planning provisions, the required content of which is set forth in 40 C.F.R. § 35.917–1 (1976),[24] prior to the

109(m), 109(*o*), 109(q), 109(r), 109(s), 109(t); (2) *Discussed Elsewhere*: 109(a), 109(b), 109(c), 109(d), 109(e), 109(f), 109(g), 109(h), 109(i), 109(j), 109(k), 109(*l*), 109(p), 109(s), 109(t), 109(u), 109(v); (3) *Frivolous*: 109(b), 109(e), 109(f), 109(m), 109(n), 109(*o*).

**22.** Specifically they claim the likelihood of periodic ruptures causing environmental and economic losses unavoidable without increased cost of construction, and that the cumulative impacts of the SWSD outfall with other outfalls will multiply the adverse effects.

**23.** The EIS evaluates the concept of outfalls applicable to both Wantagh and SWSD. It reveals the following information: the extent SWSD sewer lines will interfere with streams or wetlands (EIS at 8), the SWSD treatment plant site (EIS at 9, 27, 102), the area and population the plant will serve, and present treatment facilities in the district, the source of influent to the treatment plant, the plant's construction and the disposition to be made of digested sludge (EIS at 27), the provision for additional land to accommodate expansion to institute recharge (EIS at 99), construction

methods intended to minimize temporary environmental insults (EIS at 100), disposition of treated effluent (EIS at 111), and public relations concerning SWSD (EIS at 204). Significant additional portions of the EIS pertain to the SWSD, though not in their entirety. *E. g.*, EIS at 103–10.

**24.** In accordance with 40 C.F.R. § 35.917–1 (1976), the facilities plan to the extent deemed appropriate by the Regional Administrator, must encompass, in part, a description of the treatment works including engineering data, cost estimates and a schedule for completion of design and construction, a cost-effectiveness analysis of alternatives to the works, an evaluation of alternate means of ultimate disposal of treated wastewater and sludge, an assessment of the expected environmental impact of alternatives, and an identification of effluent limitations. Facilities planning shall be conducted only to the extent necessary to insure the facilities "will be cost effective and environmentally sound and to permit reasonable evaluation of grant applications and subsequent preparation of designs, construction drawings and specifications." 40 C.F.R. § 917–4(b) (1976).

award of any federal funds for step 2 or step 3 grants. 40 C.F.R. § 35.917(d) (1976).

Before awarding grant assistance the Regional Administrator must determine that the applicable NEPA requirements as set forth in 40 C.F.R. Pt. 6 (1976), which governs the preparation of environmental impact statements, have been complied with. 40 C.F.R. § 35.925–8 (1976). Subpart E of Part 6 of 40 C.F.R. (1976) governs compliance with NEPA by the FWPCA treatment works grant program. Section 6.504(b)(2) of 40 C.F.R. (1976) makes clear that the award of step 1 grant assistance is not subject to the requirement that an EIS be prepared. Thus the preparation of a facilities plan antecedes any proposal for federal action. In *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), the respondents sought a comprehensive EIS covering contemplated as well as proposed projects which the Court rejected, stating:

> "The statute . . . speaks solely in terms of *proposed* actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects."

*Id.* at 410 n. 20, 96 S.Ct. at 2730. *See also id.* at 414–15 n. 26, 96 S.Ct. 2718. An EIS may be required at the time of the Administrator's approval of the facilities plan after its completion, or at the time of an award of a step 2 or step 3 grant if an approved facilities plan was not required or when the project or its impact has changed significantly from that described in the approved facilities plan. 40 C.F.R. §§ 6.504(a)(2), (3) & (4) (1976). *See also* 40 C.F.R. §§ 6.200, 6.510 (1976).

Bay Park has received a section 201(g)(1) grant for overall facilities planning concerning its possible expansion and upgrading. As appears from the affidavit of Rich-

ard Salkie, P. E., Chief of the New York Construction Grants Branch of the Facilities Technology Division, Region II, EPA (Aug. 30, 1977), the state has not yet submitted a facilities plan which has received EPA approval nor has there been any step 2 funding. Nor is there any basis for the plaintiffs' charge that in fact the defendants, in bad faith, have decided to fund expansion of Bay Park and are engaging in a charade. *See County of Suffolk v. Secretary of Interior,* 562 F.2d at 1368, 1388–1390 (2d Cir. 1977).

There is no perfect EIS and no EIS will completely satisfy all concerned, but upon review we find that with the above shellfish exception the EIS covering all of the projects involved in this litigation complies with the statute and adequately considers all of the pertinent environmental factors.

### FWPCA Claims

The remainder of plaintiffs' attack upon the defendants is based upon the provisions of the Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92–500, §§ 101–517, 86 Stat. 816, 33 U.S.C. §§ 1251–1376 (Supp. V 1975). While NEPA requires agencies to give careful consideration to the environmental impacts of any proposed action including all viable alternatives before issuing an EIS, FWPCA goes further and seeks the elimination by 1985 of all discharges of pollutants through two interim stages of required technology. Section 101(a)(1). Publicly owned treatment works under the two phase approach are required to achieve secondary treatment by 1977, section 301(b)(1)(B), and best practicable waste treatment technology by 1983. Section 301(b)(2)(B). While not all the provisions of FWPCA are tied to funding, EPA is authorized under the Amendments to make construction grants to any state or municipality up to the time that areawide plans have been developed and approved and management agencies designated and approved. Section 201(g)(1). Thereafter no grant shall be made unless the proposal conforms to an approved plan. Sections 204(a)(1), 208(d). Other provisions provide

for the application of the best practicable waste treatment technology over the life of the works for federally funded projects and for the application of technology at a later date which will provide for reclaiming or recycling of water or otherwise eliminate the discharge of pollutants. Section 201(g)(2). Compliance with NEPA does not necessarily constitute compliance with FWPCA, but the preparation of an EIS often requires consideration of the same factors involved in determining compliance with FWPCA. Here the plaintiffs charge the defendants with violation of many of the provisions of the FWPCA arising out of the same facts upon which they predicate their challenge to the adequacy of the EIS by condemning ocean outfalls and claiming that treated wastewater recharge is the only solution to the preservation of the quality and quantity of ground water in the Bi-County area.

Before addressing each alleged violation of the 1972 Amendments, it is necessary to explain that both parties have assumed that this Act is applicable in all respects to the grants for construction of the sewage treatment projects herein involved. This is not the fact. Many of the 1972 amendments apply to grants for construction made after October 18, 1972 and not to prior grants, as to which section 8 of the Federal Water Pollution Control Act of 1948, as amended, Ch. 758, 62 Stat. 1155 (1948), *formerly codified at* 33 U.S.C. § 1158, is applicable. In this case as appears from the appendix, the grants for Wantagh and SWSD treatment plants and outfalls were initially funded prior to 1972. Subsequently there were increases in the same grants made after 1972 for both projects under section 206(a) & (c) of the FWPCA, which, however, did not compel the application to these projects of

the funding limitations in section 201(g)(2) or of the cost-effectiveness analysis requirements in section 212(2)(B) & (C) and 40 C.F.R. Pt. 35, Subpt. E, app. A (1976). Section 4(c) of Pub.L. No. 92–500.[25]

### Alleged Violation of the FWPCA Goals

In charging a violation of FWPCA goals plaintiffs have incorporated in the fifth claim a hodgepodge of allegations charging the state and federal defendants with violations of sections 101(a), 201, 208 and 303(e) of FWPCA, which, in substance, is no more than a charge that the defendants have for the present resorted to ocean outfalls for treated effluent disposal rather than the plaintiffs' program of recharging treated wastewater into the aquifers of Nassau and Suffolk counties. Plaintiffs present a tedious review of many violations which we believe to be fictitious and which we will not address individually since they are numerous and are merely a conclusory rephrasing and repetition of the same complaints which we have heretofore answered. Little will be gained by referring to all the specific sections of the Act which plaintiffs claim were violated but, nevertheless, reference to some of said sections is unavoidable.

Among the charges included in this claim is the failure to (a) pursue actively, optimal methods of ground water recharge and recharge technology, (b) implement the best practicable waste treatment technology, and (c) prepare an analysis of the extent of the elimination of the discharge of pollutants and the level of water quality pursuant to section 305(b)(1)(C), and require a monitoring program in accordance with section 308(a).

■ (a) In answer the defendants specifically refer to their recharge experiments

---

**25.** Section 4(c) is part of the savings provisions of FWPCA and is contained in a note to section 101, 33 U.S.C. § 1251 (Supp. V 1975), *also reprinted in* [1972] U.S.Code Cong. & Ad.News 1049–50; Legislative History at 84. It provides:

"The Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of this Act [Oct. 18, 1972] shall remain applicable to all grants made from

funds authorized for the fiscal year ending June 30, 1972, and prior fiscal years, including any increases in the monetary amount of any such grant which may be paid from authorizations for fiscal years beginning after June 30, 1972, except as specifically otherwise provided in section 202 of the Federal Water Pollution Control Act as amended by this Act [section 1282 of this title] and in subsection (c) of section 3 of this Act."

in Nassau and Suffolk at Bay Park, Riverhead, and Wantagh, and to the immediate danger of polluting the aquifers with viruses, heavy metals, toxic organic compounds, and carcinogens if recharge is implemented before testing and engineering techniques demonstrate that it is safe.[26] At this point we believe it is only fair to emphasize the fact that the defendants have attempted in many ways to solve the problems surrounding recharge to the area's ground water as explained hereafter.

From 1964 to 1973 the State funded a recharge project of 500,000 gallons per day of highly treated wastewater through deep well injection to prevent salt water intrusion. Problems encountered included clogging of the wells over a long period of time and potentially adverse changes in the quality of ground water adjacent to the injection area. From 1964 to 1968 a second experiment by the State was conducted at Riverhead in Suffolk County where 50,000 gallons per day were recharged through a series of shallow wells, and the same clogging problems were encountered. In addition, recharge projects of 100,000 and 200,-000 gallons per day are underway by the State to test the technical feasibility of the basin method of recharge.

In 1973 EPA funded a study completed in the same year for the purpose of determining the feasibility of designing a large-scale demonstration recharge project for advanced treatment and recharge of 5 mgd at the Wantagh treatment plant. 40 C.F.R. § 35.908 (1976). Upon completion of the study the defendants set aside $21 million to build the project. Construction has begun and is expected to be completed by the end of 1978. The project will be operated for a three to five year period; it will utilize shallow wells and spreading basins, and the objective will be to conduct epidemiological studies and to determine cost

effectiveness, efficiency, the effects of recharge on ground water quality and whether the processes designed will permit large-scale recharge over a continuous period of time. EIS at 39–45; Local rule 9(g) statement ¶¶ 53–58, 63; Affidavit of Eugene Seebald, P. E., Director of the Division of Pure Waters of the DEC, ¶¶ 38–59 (Oct. 17, 1975).

(b) Plaintiffs allege a violation of section 201, claiming, in effect, that the Administrator is enjoined from making grants unless the works proposed would provide for the application of the "best practicable waste treatment technology over the life of the works" ("BPWTT") consistent with the purposes of the Act.

 Plaintiffs complain here and elsewhere in the complaint that the defendants have violated the non-degradation policy of FWPCA in that their actions will result in degradation of the bays, streams, lakes and ocean. From our examination of the record it appears that the funding of Wantagh and SWSD initially occurred before the 1972 amendments and consequently the provisions and standards of section 201(g) of the amendments are inapplicable until July 1, 1983. See section 301(b)(2)(B). However, section 201(b) is not tied to funding and may be applicable to all waste treatment management plans regardless of the funding date of the project. In such event, plaintiffs' view of the problem is one-sided because they do not recognize that adoption of an unsafe recharge alternative will degrade the area's lakes, streams, bays and drinking water supply. Outfall disposal of treated effluents has not been considered by EPA in isolation and it cannot be said under these circumstances that the Administrator should not protect the quality of potable water on Long Island by the preclusion of recharge at the present

---

**26.** Plaintiffs' allegation of violation of the area-wide waste treatment planning requirements of section 208 here is premature, and their allegation that defendants have not issued information concerning salt water intrusion required

by section 304(e)(2)(E) is completely without merit since the EPA issued in 1973 a publication which meets the requirements of this section.

time. The Act, fortunately, is not absolute in its mandate of treatment choices, nor does it condemn that temporary pollution necessary to avoid permanent and irrevocable pollution which would cause greater hardship and threat to the public welfare. We cannot find the Administrator's approval of outfall sewering to be an arbitrary and capricious violation of the BPWTT standard as set forth in the statute.

Section 201(b) provides for the application of BPWTT "including reclaiming and recycling of water, and confined disposal of pollutants so they will not migrate to cause water or other environmental pollution and shall provide for consideration of advanced waste treatment techniques." Plaintiffs claim that this section mandates recharge of treated wastewater in the Bi-County area. Plaintiffs do not adequately address the defendants' response that reclaiming and recycling of wastewater by recharge at the present time in the Bi-County area would also cause water pollution. Were we to read the statute in the unbending manner suggested by the plaintiffs, there would be a conflict in the very subsection of the statute because the plan they rely upon might also result in water pollution. However, we find that the term "practicable" itself suggests an approach to water treatment and disposal which is reasonable and prudent under all of the surrounding circumstances. "Practicable" does not call for a wooden interpretation as if Congress had mandated a particular method of wastewater treatment and disposal for all situations at all times.

A flexible approach permits a harmonious reading of the other subsections of section 201. In section 201(g)(2)(A) the grant applicant in order to obtain federal funding is required to have studied and evaluated alternative techniques and demonstrate that its choice incorporates the BPWTT. If the

statute required reclaiming and recycling of water by every public treatment work, there would be little need to examine alternative management techniques. Similarly, there would be no need as provided in section 201(g)(2)(B) for provision in a proposed works for allowance "to the extent practicable [for] the application of technology at a later date which will provide for the reclaiming or recycling of water or otherwise eliminate the discharge of pollutants."[27]

The legislative history also supports the conclusion that the use in FWPCA of the term "BPWTT" contemplates an evaluation of *all* of the environmental circumstances involved in a particular proposed water treatment plant. As appears from the statement of the House Committee on Public Works Report on FWPCA:

"The term 'best practicable waste treatment technology' covers a range of possible technologies. There are essentially three categories of alternatives available in selection of wastewater treatment and disposal techniques. These are (1) treatment and discharge to receiving waters, (2) treatment and reuse, and (3) spray-irrigation or other land disposal methods. No single treatment or disposal technique can be considered to be a panacea for all situations and selection of the best alternative can only be made after careful study."

H.R.Rep.No.92–911, 92 Cong., 2d Sess. 87 (1972), *reprinted in* Legislative History at 774. *See also* Legislative History at 165, 245, 437, 839, 1441–42. In approving an ocean outfall sewering program for the Bi-County area, we are satisfied that the Administrator has complied with the applicable provisions of FWPCA.

(c) In paragraph 109(p) of the complaint, incorporated into the fifth claim,

27. The Administrator has published pursuant to section 304(d)(2) information on alternative waste treatment management techniques and systems available to implement section 201, entitled "Alternative Waste Management Tech- niques for Best Practicable Waste Treatment," EPA–430/9–75–013 (Oct. 1975), which supports our construction of the requirements imposed by section 201.

plaintiffs allege a violation of section 305(b)(1)(C) which requires each state to prepare and submit to the Administrator a report, to be updated each year. This report must include "an analysis of the extent to which the elimination of the discharge of pollutants and a level of water quality which provides for the protection and propagation of a balanced population of shellfish, fish, and wildlife and allows recreational activities in and on the water, have been or will be achieved by the requirements of this Act, together with recommendations as to additional action necessary to achieve such objectives." *Id.* As appears from the uncontested affidavit of Harry L. Allen, Water Quality Standards Coordinator for Region II, EPA (Sept. 2, 1977), the State of New York has submitted these reports annually in compliance with the statute.

■ Plaintiffs have also charged a violation of section 308(a) [28] which provides that "[w]henever required" to carry out the objectives of the chapter, the Administrator shall require the owner or operator of any point source to sample the effluent, monitor and report on the operation of the facility as prescribed by the Administrator. If the preconditions for the application of this requirement as stated in section 308(a) exist, then the Administrator has a nondiscretionary obligation to require monitoring and reports. *Committee for Consideration of Jones Falls Sewage System v. Train*, 387 F.Supp. 526, 530 (D.Md.1975).

In compliance the Administrator has promulgated the following regulations which govern monitoring of publicly owned treatment works: (1) 40 C.F.R. §§ 35.925–10 & 35.935–12 which mandate monitoring upon all projects receiving step 3 grant assistance under FWPCA; (2) 40 C.F.R. §§ 124.61–124.64, 125.27 which mandate monitoring as part of the discharge permit system; and (3) 40 C.F.R. § 35.835–7 which mandates monitoring upon treatment works funded after January, 1970 pursuant to the Federal Water Pollution Control Act of 1948, as amended. In addition, EPA has, on a case by case basis, requested the preparation of operation and maintenance manuals for treatment works funded prior to January, 1970 pursuant to the previous Act. Affidavit of Richard Salkie, P. E., Chief of New York Construction Grants Branch of Facilities Technology Division, Region II, EPA (Sept. 7, 1977).

■ While none of the regulations cited were explicitly promulgated pursuant to section 308(a), we decline to find any infirmity on that basis since plaintiffs have not attacked the regulations but have only alleged a general violation of the section. *Cf.* 5 U.S.C. § 553(b)(2); *Hooker Chemicals & Plastics Corp. v. Train*, 537 F.2d 620, 629–30 (2d Cir. 1976). Furthermore, as appears from the record, each of the treatment plants here in issue is subject to monitoring requirements. SWSD, when completed, will be subject to the requirements of 40 C.F.R. § 35.835–7 and those imposed in ac-

---

**28.** Sec. 308(a) "Whenever required to carry out the objective of this Act, including but not limited to (1) developing or assisting in the development of any effluent limitation, or other limitation, prohibition, or effluent standard, pretreatment standard, or standard of performance under this Act; (2) determining whether any person is in violation of any such effluent limitation, or other limitation, prohibition or effluent standard, pretreatment standard, or standard of performance; (3) any requirement established under this section; or (4) carrying out sections 305, 311, 402, and 504 of this Act—

(A) the Administrator shall require the owner or operator of any point source to (i) establish and maintain such records, (ii) make such reports, (iii) install, use, and maintain such monitoring equipment or methods (including where appropriate, biological monitoring methods), (iv) sample such effluents (in accordance with such methods, at such locations, at such intervals, and in such manner as the Administrator shall prescribe), and (v) provide such other information as he may reasonably require; . . . ."

cordance with the discharge permit system. Wantagh must comply with those imposed in 40 C.F.R. § 125.27 pursuant to its section 402 discharge permit, and it must submit to EPA an operation and maintenance manual for review, and a similar manual is required for the recharge demonstration project. Bay Park similarly must comply with 40 C.F.R. § 125.27 as required by its discharge permit.

### Failure of Administrator to Prepare a Comprehensive § 102(a) Program

In the sixth claim plaintiffs charge that the federal and state defendants have failed to prepare or .develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters and ground waters and improving the sanitary condition of surface and underground waters in violation of sections 102(a), 101(b) and 101(d) of FWPCA. Under section 102(a) the Administrator is required to prepare such plan in cooperation with other federal agencies, state water pollution control agencies, interstate agencies, etc., which obligation is non-discretionary. *See Committee for Consideration of Jones Falls Sewage System v. Train, supra,* 387 F.Supp. at 530–31 (D.Md.1975); *Appalachian Power Co. v. Train,* 545 F.2d 1351, 1370 (4th Cir. 1976). The federal defendants concede that they have no such comprehensive program but state that they have funded state and local planning programs and sewage facilities related to achieving abatement of such pollution. The federal defendants argue that section 102(a) does not require the federal government to duplicate local and state planning already in progress. In support of their argument, defendants describe the documents and state reports set forth in the margin [29] as sufficient to satisfy the requirement of a section 102(a) comprehensive program. We are cognizant of the policy set forth in section 101(f) to discourage needless duplication and unnecessary delays at all levels of the government, as well as Congress' recognition of the primary responsibilities and rights of states to prevent, reduce, and eliminate pollution as stated in section 101(b).

These state planning programs are not sufficient, however, to emasculate the language of section 102 which we view as an explicit mandate to the Administrator to prepare a comprehensive program for water pollution control, and we believe that this responsibility cannot be abdicated by reference to the EIS or the reports or programs of state water pollution control agencies. *See* FWPCA § 516. Nothing short of a genuine federal preparation of such a program will comply with the statute and provide the clear and effective means to achieve the objectives of the Act. 5 U.S.C. § 706(1). *Cf. Natural Resources Defense*

---

**29.** (a) The EIS which explored in detail the programs for preventing and eliminating pollution of the areas navigable and ground waters;

(b) The state summary report of the current status of the state pollution control program filed within four months after October 18, 1972, and the state's program for the prevention, reduction and elimination of pollution submitted during the same period and annually thereafter pursuant to § 106(f)(1) & (3) as conditions of grants made and approved by the Administrator under section 106;

(c) A proposed continuing planning process report filed annually with the Administrator for his approval as required by § 303(e) of the Act, which must be consistent with the Act and include, among other things, incorporation of the elements of any applicable areawide waste management plans under § 208 and any applicable basin plans under § 209. "The Administrator is required only to approve the process, not the specific plans that the process pro-

duces." *City of New Haven v. Train,* 424 F.Supp. 648, 652 (D.Conn.1976);

(d) The § 208 plan, due January 1, 1978, from the Nassau-Suffolk Regional Planning Board designated by the Governor to develop effective areawide waste treatment management plans for Nassau and Suffolk counties as an area which the Governor identified and designated as an area with substantial water quality control problems and in connection with which the Administrator approved a grant of $5.2 million. Among other matters under consideration in the § 208 plan being prepared are development of recharge standards for suspended solids, heavy metals, toxic organics, viruses and nitrates, and detailed information concerning where to recharge, by what method, for how long a period of time, in what quantities and for what purpose. Nassau-Suffolk Regional Planning Board, *Workplan and Scope of Services* (May 1975).

Council, Inc. v. Callaway, supra, 524 F.2d at 86; Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, 508 F.2d 927, 931–33 (2d Cir. 1974), vacated and remanded, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), reversed on remand, 531 F.2d 637 (2d Cir. 1976); Greene County Planning Board v. FPC, 455 F.2d 412, 419–20 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). While we find clear the statutory requirement that the Administrator prepare a comprehensive program, we find nothing in the statute which prevents the Administrator after making a careful investigation from expressly adopting the same or similar conclusions reached by the state if such is deemed to be appropriate in good faith and by the exercise of independent judgment. Cf. East 63rd Street Ass'n v. Coleman, 414 F.Supp. 1318, 1328 (S.D.N.Y.), aff'd by order, 538 F.2d 309 (2d Cir. 1976). This conclusion requires a partial denial of the defendants' motion for summary judgment and a mandate to the Administrator to prepare a section 102(a) comprehensive program. We note that contrary to plaintiffs' assertions, section 102(a) imposes no obligations upon the state defendants.

### Failure to Adopt a Proper Continuing Planning Process

■ In their seventh claim plaintiffs attack the state's Continuing Planning Process ("CPP") required under section 303(e), alleging that it is inconsistent with the goals and mandates of FWPCA, and will cause degradation of the area's resources because of its reliance upon coastal secondary treatment plants and outfall disposal. This is a variation of an old theme consisting of a repetition of plaintiffs' claim that immediate recharge is the proper, necessary and only method of wastewater disposal in the Bi-County area. Assuming that the 1972 amendments are applicable to the projects in issue, plaintiffs frame their attack on the proposition that the present CPP is ill-suited to the water needs of the

area and that it fails to address the peculiar requirements of a ground water system. We reject these claims, and add that the CPP does address the Bi-County area's needs in the following respects:

(1) It includes the area as a major drainage basin as to which water quality management plans are to be completed which will implement applicable effluent limitations and water quality standards, CPP § 130.10, Table I;

(2) It lists the area as a major basin segment which is considered a candidate for section 208 planning (which has since been accomplished), CPP § 130.11, Table II;

(3) It lists the Atlantic Ocean and Long Island Sound in Table III as areas for which a water quality management plan will be developed. CPP §§ 130.20, 130.21.

After comparing the plaintiffs' claims with the CPP itself, we find no inconsistency therein with the FWPCA.

### Improper State Priority for Funding

■ Violations by state and federal defendants of sections 101(a), 303(e)(3)(H), 106(f), 201, 208(a), 212(2) and 301(b) are charged in this eighth claim in the development and approval of New York State's priority ranking system for allocation of federal construction grants. In this claim plaintiffs allege that the ranking system fails to consider the needs of the area's ground water system, gives financial inducement to construction of coastal treatment plants and outfalls rather than recharge and other alternatives, does not value recharge as a basic criterion for priority listing and does not give due regard to the protection and propagation of wildlife, recreational purposes and the water supply. Again, the issue is simply immediate recharge versus immediate outfall sewering.

The state's Criteria for Determining Priority Municipal Sewage Treatment Projects (Sept. 14, 1973) sets forth a numerical prior-

ity rating system in which projects are awarded points on four scales (water pollution control need factor, existing conditions factor, water quality classification factor, and the inter-governmental need factor) and projects are then ranked in the order of total points. This system provides for the allocation of the limited funds available among competing projects statewide. Affidavit of Eugene Seebald, P. E., Director of the Division of Pure Waters of the DEC, ¶¶ 79–83 (Oct. 17, 1975). In view of the defendants' conclusion that immediate recharge is neither safe nor technologically feasible, and state defendants' responsibility for allocating limited resources for the abatement of pollution throughout New York State, we find no abuse of discretion in the state's method of allocation, and the federal government's approval thereof. *See Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 415, 91 S.Ct. 814; *Bethlehem Steel Corp. v. EPA,* 538 F.2d 513, 518 (2d Cir. 1976).

### Failure to Establish Section 302(a) Effluent Limitations

Section 302(a) requires the Administrator to establish more stringent effluent limitations and alternative control strategies which can reasonably be expected to contribute to the attainment or maintenance of the water quality goals as set forth in this section [30] whenever in his judgment achievement of such goals would be interfered with by discharges of pollutants from point sources which conform to the effluent limitations established in section 301(b)(2). As applied to publicly owned waste treatment works, section 301(b)(2)(B) requires compliance not later than July 1, 1983, with the BPWTT standard set forth in section 201(g)(2)(A). Plaintiffs charge in their ninth claim that the defendants have violated section 302(a) as well as sections 101(a) and 102(a). They argue that in the absence of effluent limitations for recharge, the defendants are in no position to assert that recharge is unsafe.

However, such absence offers no basis for the plaintiffs' claim that recharge is safe, inasmuch as review of the scientific data presented in the EIS establishes a reasonable basis for concluding that recharge is unsafe and outfall sewering is the appropriate means for wastewater disposal and remedy for present ground water pollution in the Bi-County area. Similarly, we find there are no material facts in dispute requiring the Administrator to exercise his discretion to impose effluent limitations as prescribed by section 302(a) for the present time in the Bi-County area.

### Failure to Implement Waste Treatment Management Plans

Plaintiffs are apparently confused in charging in their tenth claim that federal and state defendants have failed to prepare section 201(a) waste treatment management plans because no such mandate is contained in section 201(a). That section sets forth the standards to be met in the preparation of plans required elsewhere such as in section 208 and in the funding of wastewater treatment works. It does contain a congressional declaration of purpose which sets forth guidelines but does not itself require the preparation of a distinct

---

**30.** Section 302(a):

"Whenever, in the judgment of the Administrator, discharges of pollutants from a point source or group of point sources, with the application of effluent limitations required under section 301(b)(2) of this title, would interfere with the attainment or maintenance of that water quality in a specific portion of the navigable waters which shall assure protection of public water supplies, agricultural and industrial uses, and the protection and propagation of a balanced population of shellfish, fish and wildlife, and allow recreational activities in and on the water, effluent limitations (including alternative effluent control strategies) for such point source or sources shall be established which can reasonably be expected to contribute to the attainment or maintenance of such water quality."

plan. We have addressed elsewhere the claimed violation by defendants of the planning and funding provisions of FWPCA, which discussion adequately deals with adherence to the standards in section 201 in the proper context.

### Failure to Designate the Bi-County Area for Section 208 Planning

■ Section 208 of FWPCA is a provision which provides for the identification by the Governor of a state of each area within the state which has substantial water quality control problems, which then sets in motion areawide waste treatment management planning to cover a twenty-year time period by a local, representative agency. The areawide plan formulated, after being certified by the Governor, must be submitted to the Administrator for his approval and thereafter the Administrator shall not make any grant for construction of a publicly owned treatment works under section 201(g)(1) except in conformity with the plan. In their eleventh claim plaintiffs allege a violation of section 208 by the Governor's failure to designate the Bi-County area for areawide waste treatment management planning, but this claim is now moot as appears below.

On December 27, 1974, the Governor of the State of New York notified the Administrator of his designation of all of Nassau and Suffolk counties as an area which as a result of urban-industrial concentrations or other factors, has substantial water quality control problems, and he further designated the Nassau-Suffolk Regional Planning Board ("Board") as capable of developing effective areawide waste treatment management plans for the area. Section 208(a)(2). On April 27, 1975, the Administrator approved the Governor's designation and on May 5, 1975, a citizens advisory council to the Board was established which consists of ten separate categories of interest groups, including an environmental category. In June of 1975 the Board and EPA

signed a contract providing the Board with a $5.2 million section 208 grant, which was at that time the largest grant in the country.

On January 1, 1976, the Board had in operation a continuing areawide waste treatment management planning program as required by section 208(b)(1). See 40 C.F.R. § 35.222–1(a) (1976). Pursuant to the requirements set forth in section 208(b)(1) and 40 C.F.R. § 35.222–1 (1976), the initial waste treatment management plan must be certified by the Governor and submitted to the Administrator not later than January 1, 1978.

### Failure to Convert SWSD to a Recharge Facility

■ In the thirteenth claim the plaintiffs charge that the above failure to redesign SWSD constitutes a violation of sections 101(a), 102(a), 106(f), 201 and 303(e) of FWPCA. There are two answers to this charge. First, the provisions of these sections are not presently applicable to SWSD since it was funded before 1972. Second, while the requirement for BPWTT will become applicable to SWSD in 1983, it is premature to charge the defendants presently with a violation of that standard, and to assume in advance that the defendants will abuse their discretion in choosing the BPWTT. We have discussed the application of sections 102(a) and 303(e) elsewhere.

### Failure to Maintain State Water Quality Standards in Surface Waters

■ The substance of the fourteenth claim is that FWPCA requires compliance with New York State water quality standards, and use of the SWSD plant and outfall will prevent attainment of such standards for surface waters in the Bi-County area in violation of section 301(b)(1)(C). Plaintiffs assert that the defendants have therefore a nondiscretionary duty to redesign SWSD to achieve effluent

limitations necessary to meet the standards of water quality set by the state.

At the outset it is recognized that the water quality standards established pursuant to any state law or regulations are applicable to SWSD discharges regardless of its funding date, because of the permit requirements of the statute, sections 301(a) & 402. There are three answers to the plaintiffs' charge: (1) SWSD has not yet been completely constructed and plaintiffs cannot and do not allege a present violation. Therefore their claim is premature; (2) the purpose of the State water quality statutes and regulations is to protect receiving waters and the waters into which they flow from the discharge of injurious pollutants. *See, e. g.,* N.Y. Environmental Conservation Law §§ 17–0105(17), 17–0301, 17–0501 (McKinney 1973 & Supp. 1976–77); 6A N.Y. C.R.R. § 701.2 (1977).[31] Any discharge of pollutants from SWSD in the future will not be into the streams or lakes of the Bi-County area, directly or indirectly, and (3) when SWSD becomes operative, it must comply with the state water quality standards and obtain a permit. Should such a permit issue, review of the Administrator's action may be had in the Circuit Court of Appeals pursuant to section 509(b)(1)(E), but not in this court. *Sun Enterprises, Ltd. v. Train,* 532 F.2d 280 (2d Cir. 1976). At best, this claim is premature.

### Failure to Prepare Comprehensive Economic Analysis under FWPCA

Plaintiffs' seventeenth claim charges the federal defendants with having failed to require the preparation of a comprehensive economic analysis of the proposed treatment works and alternatives as required by section 212(2)(B) and the guidelines promulgated pursuant to section 212(2)(C) at 40 C.F.R. Pt. 35, Subpt. E, app. A (1976). Defendants concede that these requirements were not met, but they claim that the cost effectiveness guidelines have

no application to either the SWSD or the Wantagh projects. We agree.

As we have noted before, these sections are inapplicable to the projects here in issue since the initial grants were not made under the 1972 Amendments and consequently the projects are exempt from these requirements of FWPCA under section 4(c) of the savings provisions of Pub.L. No. 92–500. The exemption is required not only by the statute itself, but also by the fact that the projects have been approved and such a *post hoc* economic cost analysis would be an exercise in futility.

### Failure to Acquire Land for Recharge

Section 201(g)(2)(B) provides that the Administrator shall not make grants for treatment works unless the applicant has demonstrated that "as appropriate" the works will take into account and allow to the extent practicable the application of technology at a later date which will provide for reclaiming or recycling of water or otherwise eliminate the discharge of pollutants. Plaintiffs state in their eighteenth claim that defendants have violated this section by their failure, among other things, to develop a land-use plan to acquire suitable land for wastewater recharge. A short answer to this charge is that the section is not applicable to the projects in issue because they were not funded under the 1972 Amendments.

It is only fair, however, to point out that New York State has since 1970 required that all sewage treatment facilities built or designed on Long Island be constructed in a modular fashion, allowing for the future addition of advanced wastewater treatment equipment which could be utilized with recharge, and it has further required that land be set aside in proximity to proposed secondary treatment plants on which advanced waste treatment systems could be constructed. Furthermore, we should add that there is in process a section 208 area-

---

31. *See* Statement of Hon. Russell E. Train, Legislative History at 1114, 1154–55; Statement of Hon. William D. Ruckelshaus, Legislative History at 1179, 1181–82, 1233. Federal approval of New York State water quality standards is contained in 40 C.F.R. § 120.10 (1976).

wide waste treatment management plan to cover a twenty-year period for the Bi-County area which will take into consideration feasible land use alternatives and the acquisition requirements for the area in accordance with the mandates of sections 208(b)(2)(I) & (K) and 40 C.F.R. § 131.11 (1976). *See* Nassau-Suffolk Regional Planning Board, *Workplan and Scope of Services* (May 1975).

*Failure to Provide for Public Participation Pursuant to FWPCA*

■ Section 101(e) of FWPCA and 40 C.F.R. Pt. 105 (1974) require defendants to consult and invite comments of interested persons with respect to Federal and State water pollution control activities. Plaintiffs charge defendants in the nineteenth claim with failure to observe these requirements with respect to (a) section 208 areawide planning information meetings, (b) the establishment of the state's priority system of waste treatment projects, and (c) the alleged expansion of Bay Park. We can at the threshold reject the subclaim as to Bay Park expansion as premature since a facilities plan has not yet been adopted and the time for public hearings for advice has not yet expired. 40 C.F.R. § 35.917–5 (1976). The other two subclaims are easily answered.

(a) Section 208 Areawide Information Meetings. Prior to the designation of the section 208 planning areas and agencies, the regulations require the Governor after adequate public notice to hold one or more public hearings within the proposed 208 planning area in order to gain public advice on the designation of the planning area and agency. 40 C.F.R. § 126.30 (1974). There is no question that the Governor of New York prior to such designation held hearings in New York City on January 24, 1974, after notice had been sent to all town, county, planning and zoning officials in the Bi-County area, and the DEC issued a press release to all newspapers, radio and television stations in the State. Plaintiffs com-

plain that they were not individually invited and they received no notice of the hearing, which complaint we find constitutes no violation of the statute or applicable regulations. Indeed, there was a second hearing on January 20, 1975, held at Hauppauge in Suffolk County by the DEC on the designation of Nassau and Suffolk counties as an area with substantial water quality control problems, with respect to which there is apparently no dispute that adequate notice was received and at least one of the plaintiffs attended and participated. Affidavit of Claire Stern, Executive Director of the Long Island Environmental Council, ¶ 6 (Oct. 31, 1975).

(b) Priority List for State Projects. In the preparation of the state's project priority list the regulation requires public participation by means of a public hearing pursuant to 40 C.F.R. § 35.556 (1974). The Regional Administrator of EPA may not approve such list unless he determines that such a public hearing was held.

In this instance the State did hold hearings in Albany on June 3 and 4, 1975, on the proposed priority list for fiscal year 1976, the year in issue. Applicable federal regulations mandate that notice of a hearing shall be well publicized among interested or affected persons or organizations as soon as the hearing is scheduled, and at least thirty days in advance, but if it is necessary to provide fewer than thirty days' notice the notice shall state the reasons therefor. 40 C.F.R. § 105.7(d) (1974). Two of eight of the plaintiffs, including EDF, claim they received only one day's notice and one of the plaintiffs claims it received no notice. As to the remainder the record is silent. The facts show the hearings were adequately publicized by the following: Public notice was published twice, on May 16th and 23d, in eight newspapers statewide, and in Newsday on May 19th and in the New York Times on May 23d, both papers being available in the Bi-County area. Moreover, a notice of the public hearing was available in the DEC offices, and an additional press

release was distributed. EDF actually participated in the hearings. Affidavit of Ernest Trad, P. E., Associate Director of the Division of Pure Waters of DEC (Sept. 6, 1977). Under these circumstances, we find substantial compliance by the defendants with the public participation requirements and reject the plaintiffs' claim.

## CLAIMS NOT DISCUSSED

The twelfth, sixteenth and twentieth claims for relief were not discussed because they are simply cumulative and repetitious of the claims which were discussed. We conclude that they deserve no further attention. As to these claims it follows that the defendants' motions for summary judgment must be granted. The fifteenth claim for relief has been dismissed upon the plaintiffs' stipulation.

### Conclusion

In sum, the court finds that the defendants have, with the exceptions above noted, not acted arbitrarily or in violation of the law in adopting outfall sewering for the present time in the Bi-County area rather than the recharge method of disposing of treated wastewater or other alternatives proposed by plaintiffs. The problems highlighted by plaintiffs are both serious and sensitive and the final solution remains for future advances in technology permitting the application of recharge. Further information may from time to time become available to the plaintiffs through the application and enforcement of FWPCA §§ 102(a), 104(b)(1) & (6), (d), (n)(1) & (3), 106(f)(3), 303(e)(2), 304(a), (d) & (i), 305(b), 308(b), 516, and specifically upon the filing of the 208 plan. Under the present circumstances, it is unthinkable that the court should enjoin the operation of treatment plants and outfalls or the present construction of the same subjecting the population of the Bi-County area to the danger of contaminated drinking water and the unavailability of a means of sewage disposal.

*See State of New York v. Nuclear Regulatory Comm'n,* 550 F.2d 745, 750 (2d Cir. 1977); *Triebwasser & Katz v. American Tel. & Tel. Co.,* 535 F.2d 1356, 1359 (2d Cir. 1976); *Sonesta Int'l Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973).

Upon consideration of the pleadings, memoranda, affidavits, depositions and answers to interrogatories and the accompanying exhibits, the local rule 9(g) statement of material facts not in dispute, the EIS and the administrative record compiled in the preparation thereof, and the testimony heard, the court hereby directs:

(1) dismissal of all of plaintiffs' claims found to be premature or moot, including claims four, eleven, thirteen, fourteen and nineteen with respect to Bay Park expansion;

(2) filing in this court by the federal defendants (a) no later than February 15, 1978, of a supplement to the EIS discussing and analyzing adequately the effect of outfall sewering upon the Bi-County area's shellfish industry in accordance with section 102(2)(C) of NEPA, and (b) no later than April 1, 1978, of a comprehensive program for preventing, reducing, or eliminating the pollution of the navigable waters and ground waters and improving the sanitary condition of surface and underground waters in accordance with section 102(a) of FWPCA, including updated technological data with respect to recharge;

(3) denial of summary judgment with respect to (2)(a) and (b) above, and entry of partial summary judgment with respect to all other claims and subclaims in the complaint pursuant to Fed.R.Civ.P. 56; and

(4) denial in all other respects of the plaintiffs' request for declaratory relief and motion for preliminary injunctive relief pursuant to Fed.R.Civ.P. 65.

SO ORDERED.

Appendix to follow.

## APPENDIX

### Funding Details of SWSD, Wantagh and Bay Park

SWSD:

EPA Grant for treatment plant, outfall and interceptor sewers:

| EPA Grant Action | Date of Action | Authority for Action | Grant Total (Cumulative) | Grant Eligible Cost (Cumulative) |
|---|---|---|---|---|
| Offer | March 1971 | Sec.8(f), P.L. 84-660 | $10,000,000 | $210,900,000 |
| Increase | February 1972 | Sec.8(f), P.L. 84-660 | $11,000,000 | $210,900,000 |
| Increase | March 1974 | Section 206(a), P.L. 92-500 | $90,090,000 | $280,000,000 |
| Increase | June 1975 | Section 206(a), P.L. 92-500 | $119,683,900 | $280,000,000 |
| Increase | November 1976 | Section 206(a), P.L. 92-500 | $135,476,600 | $307,600,000 |
| Increase | March 1977 | Section 206(a), P.L. 92-500 | $148,411,000 | $307,600,000 |
| Increase | June 1977 | Section 206(a), P.L. 92-500 | $169,180,000 | $307,600,000 |

EPA Grant for phase I construction of interceptor sewers, pumping stations and collection systems:

| EPA Grant Action | Date of Action | Authority for Action | Grant Total | Grant Eligible Cost |
|---|---|---|---|---|
| Offer | January 1977 | Section 201(g)(1), P.L. 92-500 | $33,611,670 (75%) | $44,815,560 |

Wantagh:

EPA Grant for treatment plant, outfall and phase I interceptors:

| EPA Grant Action | Date of Action | Authority for Action | Grant Total (Cumulative) | Grant Eligible Cost (Cumulative) |
|---|---|---|---|---|
| Offer | January 1968 | Section 8(f), P.L. 84-660 | $ 3,742,180 | $ 83,727,000 |
| Increase | December 1972 | Section 8(f), P.L. 84-660 | $45,424,800 | $151,416,000 |
| Increase | March 1974 | Section 206(a), P.L. 92-500 | $67,918,100 | $164,384,300 |
| Increase | March 1975 | Section 206(a), P.L. 92-500 | $76,334,600 | $164,384,300 |

Wantagh— Continued

EPA Grant for treatment plant, outfall and phase I interceptors:

| EPA Grant Action | Date of Action | Authority for Action | Grant Total (Cumulative) | Grant Eligible Cost (Cumulative) |
|---|---|---|---|---|
| Increase | November 1976 | Section 206(a), P.L. 92-500 | $80,826,100 | $164,384,300 |
| Increase | March 1977 | Section 206(a), P.L. 92-500 | $84,504,600 | $164,384,300 |
| Increase | June 1977 | Section 206(a), P.L. 92-500 | $90,411,365 | $164,384,300 |

EPA Grant for interceptor sewers:

| EPA Grant Action | Date of Action | Authority for Action | Grant Total (Cumulative) | Grant Eligible Cost (Cumulative) |
|---|---|---|---|---|
| Offer | March 1971 | Section 8(f), P.L. 84-660 | $ 460,530 | $46,053,000 |
| Increase | March 1974 | Section 206(a), P.L. 92-500 | $23,119,580 | $83,150,000 |
| Increase | March 1975 | Section 206(a), P.L. 92-500 | $31,580,880 | $83,150,000 |
| Increase | November 1976 | Section 206(a), P.L. 92-500 | $36,096,180 | $83,150,000 |
| Increase | March 1977 | Section 206(a), P.L. 92-500 | $39,794,380 | $83,150,000 |

EPA Grant for 5.5 mgd recharge demonstration project:

| EPA Grant Action | Date of Action | Authority for Action | Grant Total | Grant Eligible Cost |
|---|---|---|---|---|
| Offer | June 1976 | Section 201(g)(1), P.L. 92-500 | $24,588,497 (75%) | $32,784,662 |

EPA Grants for construction of collection systems:

| EPA Grant Action | Date of Action | Authority for Action | Grant Total | Grant Eligible Cost |
|---|---|---|---|---|
| Offer | February 1977 | Section 201(g)(1), P.L. 92-500 | $13,962,750 (75%) | $18,617,000 |

## Wantagh— Continued

EPA Grants for construction of collection systems:

| EPA Grant Action | Date of Action | Authority for Action | Grant Total (Cumulative) | Grant Eligible Cost (Cumulative) |
|---|---|---|---|---|
| Offer | March 1977 | Section 201(g)(1), P.L. 92-500 | $12,961,500 (75%) | $17,282,000 |
| Increase | May 1977 | Section 201(g)(1), P.L. 92-500 | $18,697,500 (75%) | $24,930,000 |

| EPA Grant Action | Date of Action | Authority for Action | Grant Total | Grant Eligible Cost |
|---|---|---|---|---|
| Offer | June 1977 | Section 201(g)(1), P.L. 92-500 | $19,968,000 (75%) | $26,624,000 |

## Bay Park:

EPA Grant for step 1 facilities planning for possible expansion and upgrading:

| EPA Grant Action | Date of Action | Authority for Action | Grant Total | Grant Eligible Cost |
|---|---|---|---|---|
| Offer | February 1977 | Section 201(g)(1), P.L. 92-500 | $1,145,022 (75%) | $1,526,696 |

EPA Grant for sludge force main and pumps and tank covers for primary tanks:

| EPA Grant Action | Date of Action | Authority for Action | Grant Total | Grant Eligible Cost |
|---|---|---|---|---|
| Offer | April 1977 | Section 201(g)(1), P.L. 92-500 | $1,417,719 (75%) | $1,890,260 |

EPA Grant for construction of building with ozonization and ventilation system:

| EPA Grant Action | Date of Action | Authority for Action | Grant Total | Grant Eligible Cost |
|---|---|---|---|---|
| Offer | August 1977 | Section 201(g)(1), P.L. 92-500 | $1,156,913 (75%) | $1,542,511 |